**NO. 22-13361-AA**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

*Plaintiff/appellee,*

**v.**

**ANGELO MARTINEZ,**

*Defendant/appellant.*

_____

**On Appeal from the United States District Court
for the Southern District of Florida**

_____

**INITIAL BRIEF OF THE APPELLANT
ANGELO MARTINEZ**

_____

> **MICHAEL CARUSO**
> **Federal Public Defender**
> **Bunmi Lomax**
> **Assistant Federal Public Defender**
> **150 West Flagler Street, Suite 1700**
> **Miami, Florida 33130-1555**
> **Telephone No. (305) 533-4176**

---

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)**

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States of America v. Angelo Martinez
## Case No. 22-13361-AA

Appellant, Angelo Martinez, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Becerra, Jacqueline, Magistrate Judge

Caruso, Michael

Casabielle, Manuel Lazaro

Charest-Turken, Gabrielle Raemy

Gonzalez, Juan Antonio

Lomax, Adebunmi

Lapointe, Markenzy

Martinez, Angelo

Martinez, Jose E., District Court Judge

Matos Pena, Justo

Miranda, Annika Marie

Perez, Robert Michael

C-1 of 2

Rubio, Lisa Tobin

Suero Terrero, Eric Manuel

Torres, Edwin G., Magistrate Judge

Vigilance, Michele S.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This appeal raises two complex questions of constitutional law that are issues of first impression in this Circuit. While the Court has previously considered other challenges to the Maritime Drug Law Enforcement Act, the jurisdictional and constitutional questions in Issues I and II of this brief have never before been decided by this Court. These issues are currently being litigated in district courts throughout the circuit[1] and the Court's full attention is needed in order to bring resolution to this evolving area of constitutional law. Mr. Martinez respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision making process.

---

[1] These issues are also pending in other cases currently before the Court, including *United States v. Lopez-Padilla*, No. 22-11047, and *United States v. Jhonathan Alfonso*, No. 22-10576.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .............................................. C-1 of 2

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS ........................................................................ v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ....................................................................................... x

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ............................................................. 2

    Course of Proceedings and Disposition in the District Court ......... 2

    Standards of Review ........................................................................ 6

SUMMARY OF THE ARGUMENTS ................................................... 7

ARGUMENTS AND CITATIONS OF AUTHORITY ........................... 10

I.    Mr. Martinez's conviction must be vacated because his offense did not occur on the "high seas" as that term is defined by international law, and therefore his prosecution fell outside of Congress' limited authority under U.S. CONST. art. I, § 8, cl. 10, to define and punish "Felonies committed on the high Seas." ................................................................................................. 10

    A.    The MDLEA rests exclusively on Congress' authority to define and punish "Felonies committed on the high Seas". ..................................................................................... 10

    B.    The term "high seas," within the meaning of the Felonies Clause, is defined by international law. ................ 12

    C.    Under international law, the Exclusive Economic Zone is not part of the high seas................................................. 18

ii

II.    Mr. Martinez's conviction must be vacated because Congress exceeded its authority under the Felonies Clause by defining a "vessel without nationality" in 46 U.S.C. § 70502(d)(1)(C) to include vessels that are not stateless under international law .......................................................................................... 20

    A.    Statutory background ........................................................... 20

    B.    Section 70502(d)(1)(C) authorizes the United States to assert jurisdiction over vessels which are not stateless under international law. ...................................................... 22

    C.    Congress exceeded its power under the Felonies Clause by defining "vessel without nationality" to include vessels that are not stateless under international law. ....... 26

    D.    This is a case of first impression ........................................... 28

        1.    The Court has never considered whether Congress' powers under the Felonies Clause are limited by international law. ......................................................... 29

        2.    The Court has never held that the protective principle – or any other recognized theory of jurisdiction – would authorize the prosecution in this case. ................................................................. 31

        3.    The protective principle of international law does not authorize the prosecution .................................... 37

III.    The United States' prosecution of Mr. Martinez, a national of the Venezuela, for a drug-trafficking offense committed 158 nautical miles southeast of the Dominican Republic (a) violated Due Process and (b) exceeded Congress' powers under the Felonies Clause because the offense bore no connection to the United States. ................................................................. 40, 41

CONCLUSION ...................................................................................... 44

CERTIFICATE OF COMPLIANCE ...................................................... 45

iii

CERTIFICATE OF SERVICE................................................................... 46

# TABLE OF CITATIONS

**Cases**

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*

    543 U.S. 157 (2004)................................................................31

*International Shoe Co. v. State of Washington,*

    326 U.S. 310 (1945)................................................................42

*Jesner v. Arab Bank, PLC,*

    138 S. Ct. 1386 (2018)............................................................14

*McDonald's Corp. v. Robertson,*

    147 F.3d 1301 (11th Cir. 1998)..............................................34

*Oklahoma v. Castro-Huerta,*

    142 S. Ct. 2486 (2022)............................................................35

*United States v. Angulo-Hernández,*

    576 F.3d 59 (1st Cir. 2009) ....................................................41

*United States v. Bellaizac-Hurtado,*

    700 F.3d 1245 (11th Cir. 2012)....................................*passim*

*United States v. Birge,*

    830 F.3d 1229 (11th Cir. 2016)..............................................34

*United States v. Cabezas-Montano ,*

   949 F.3d 567 (11th Cir. 2020)........................................................6, 43

*United States v. Campbell,*

   734 F.3d 802 (11th Cir. 2014)........................................................6, 42

*United States v. Caraballo-Martinez,*

   866 F.3d 1233 (11th Cir. 2017)..........................................................34

*United States v. Cotton,*

   535 U.S. 625 (2002)...............................................................................6, 7

*United States v. Davila-Mendoza,*

   972 F.3d 1264 (11th Cir. 2020)........................................................6, 11

*United States v. De La Garza,*

   516 F.3d 1266 (11th Cir. 2008)........................................................6, 21

*United States v. Dávila-Reyes,*

   23 F.4th 153 (1st Cir. 2022) *reh'g en banc granted,*

   *opinion withdrawn,* 38 F.4th 288 (1st Cir. 2022).  .....................*passim*

*United States v. Furlong,*

    18 U.S. (5 Wheat.) 184 (1820)...........................................6, 16, 17, 41

*United States v. Gonzalez,*

   776 F.2d 931 (11th Cir. 1985)...........................................7, 36, 37, 39

*United States v. Iguaran,*

821 F.3d 1335 (11th Cir. 2016)....................................................6, 7, 40

*United States v. Lopez Hernandez,*

864 F.3d 1292 (11th Cir. 2017)........................................... 7, 25, 26, 30

*United States v. Lopez,*

562 F.3d 1309 (11th Cir. 2009)...............................................................7

*United States v. Marino-Garcia,*

679 F.2d 1373 (11th Cir. 1982)................................................. 7, 22, 23

*United States v. Matos-Luchi,*

627 F.3d 1 (1st Cir. 2010) ...................................................................7, 23

*United States v. Nunez,*

1 F.4th 976 (11th Cir. 2021) ..............................................................7, 21

*United States v. Palmer,*

16 U.S. (3 Wheat.) 610 (1818)...........................................................7, 17

*United States v. Romero-Galue,*

757 F.2d 1147 (11th Cir. 1985)................................................. 7, 35, 36

*United States v. Smith,*

18 U.S. (5 Wheat.) 153 (1820)...........................................................8, 33

*United States v. Tinoco,*

　304 F.3d 1088 (11th Cir. 2002) ......................................................6, 8, 37

*United States v. Zakharov,*

　468 F.3d 1171 (9th Cir. 2006) ............................................................8, 43


**Statutes, Rules, and Constitutional Provisions**

18 U.S.C. § 3231 ....................................................................................10

18 U.S.C. § 3553(a) ................................................................................5, 8

18 U.S.C. § 374 ...................................................................................8, 10

21 U.S.C. § 955(c) ...............................................................................8, 35

28 U.S.C. § 1281 .................................................................................8, 10

46 U.S.C. § 70502(c) ................................................................................8

46 U.S.C. § 70502(d)(1) ....................................................................*passim*

46 U.S.C. § 70502(e) ........................................................................*passim*

46 U.S.C. § 70503(a)(1) ..............................................................2, 8, 10, 20

46 U.S.C. § 70503(b) ...........................................................................8, 10

46 U.S.C. § 70503(e) ...........................................................................8, 21

46 U.S.C. § 70505 ...............................................................................8, 29

46 U.S.C. § 70506(a) .............................................................................2, 9

33 C.F.R. § 2.30(b) ...........................................................................7, 9, 12

viii

33 C.F.R. § 2.32(d) ................................................................ 9, 18, 12, 19

U.S. CONST. art. I, § 8, cl. 10 ....................................................... *passim*

**Other Authorities**

Dunner, Barry H. and Arias, Mary Carmen, *Under International Law, Must a Ship on the High Seas Fly the Flag of a State in Order to Avoid Being a Stateless Vessel? Is A Flag Painted On Either Side Of The Ship Sufficient To Identify It?* 29 U.S.F. MAR. L.J. 99 (2016-2017) ....................................................... 9

Henkin, Louis, RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAWS OF THE UNITED STATES § 501 ........................ 9

Kontorovich, Eugene, *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes,* 93 MINN. L. REV. 1191 (April 2009) ................................................. 9, 33

Kontorovich, Eugene, *The 'Define and Punish' Clause and the Limits of Universal Jurisdiction,* 103 NW. U. L. REV. 149 (2009) ........................ 15

United Nations Convention on the Law of the Seas 1833 U.N.T.S. 397 (1982) .................................................................. 9

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Although Mr. Martinez objects to the United States' exercise of jurisdiction over his offense, the district court exercised jurisdiction pursuant to 18 U.S.C. § 3231 because the appellant was charged with an offense against the laws of the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1281 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States.

On October 4, 2022 (*see* DE 76), Mr. Martinez filed a notice of appeal, from the final judgment of the district court entered on September 22, 2022 (DE 73), that disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

### I.

Whether Mr. Martinez's conviction must be vacated because his offense did not occur on the "high seas" as that term is defined by international law, and therefore his prosecution fell outside of Congress' authority to define and punish "Felonies committed on the high Seas."

### II.

Whether Mr. Martinez's conviction must be vacated because Congress exceeded its authority under the Felonies Clause by defining a "vessel without nationality" in 46 U.S.C. § 70502(d)(1)(C) to include vessels that are not stateless under international law.

### III.

Whether the United States' prosecution of Mr. Martinez, a national of the Venezuela, for a drug-trafficking offense committed 158 nautical miles southeast of the Dominican Republic (a) violated Due Process and (b) exceeded Congress' powers under the Felonies Clause because the offense bore no connection to the United States.

1

## STATEMENT OF THE CASE

The appellant was the defendant in the district court and will be referred to by name. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document entry number ("DE"), followed by the page number, of the record on appeal.

Mr. Martinez is incarcerated.

### Course of Proceedings and Disposition in the District Court

On February 8, 2022, Mr. Martinez was named in a two-count indictment, alleging that from an unknown date through January 18, 2022, "upon the high seas and elsewhere," Mr. Martinez and a co-defendants conspired and possessed with intent to distribute five kilograms or more of cocaine while onboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70506(a) and 46 U.S.C. § 70503(a)(1) (the Maritime Drug Law Enforcement Act, or "MDLEA"). (DE 9).

Mr. Martinez moved to dismiss the indictment based on the district court's lack of jurisdiction. (DE 17). Mr. Martinez argued that the district court lacked both personal and subject matter jurisdiction to decide the

2

case and that the MDLEA was unconstitutional as applied to him. The government opposed the motion to dismiss. (DE 23). The district court ultimately denied Mr. Martinez's motion (DE 28).

On July 1, 2022, Mr. Martinez pled guilty to Count 1 of the indictment (the conspiracy count), pursuant to a written plea agreement. (*See* DE 38). In connection with the guilty plea, the parties agreed that if the case had proceeded to trial, the United States would have been able to prove the following:

> 1. On or about January 18, 2022, a United States Customs and Border Protection (CBP) Marine Patrol Aircraft (MPA) detected a go-fast vessel (GFV) approximately 158 nautical miles southeast of Isla Beata, Dominican Republic, outside the 12-mile limit of any nation's territorial seas. United States Coast Guard Cutter (USCGC) NORTHLAND and the USS MILWAUKEE were diverted to investigate. Once in the vicinity, NORTHLAND launched an Over the Horizon boat (OTH) with boarding team and the USS MILWAUKEE launched its helicopter. At this time, the helicopter crew observed the individuals on the GFV jettisoning packages. Coast Guard personnel then saw the GFV stop in the water. Shortly thereafter, the OTH made contact with the GFV and gained positive control of the vessel.

> 2. The USCG boarding team reported three individuals on board who were later identified as Angelo MARTINEZ, Eric Manuel SUERO TERRERO, and Justo Elias MATOS PENA. The master was identified as Angelo MARTINEZ, who made a claim of Colombian nationality for the GFV. The government of Colombia was contacted and stated that they could not confirm nor deny registration of the

3

vessel. The GFV was treated as a vessel without nationality, and therefore, subject to the jurisdiction of the United States and a full law enforcement boarding was conducted.

3. The USCG boarding team was able to recover six jettisoned bales and three additional bales on board the GFV, with a total sea weight of approximately 375 kilograms of suspected cocaine. Two field tests were conducted on the contraband which yielded positive results for cocaine. All three individuals, along with the suspected cocaine, were transferred to the NORTHLAND.

4. The volume and packaging of the narcotics in this case, as well as the means of transportation, are all consistent with the intent to distribute.

(DE 39).

Mr. Martinez appeared before the district court for sentencing on September 14, 2022.  His advisory range of imprisonment, as determined by the United States Sentencing Guidelines, was 108 to 135 months. (DE 65:12). Defense counsel asked the court to impose a sentence of 60 months, based on the circumstances that led to Mr. Martinez's offense. (DE 88:12). Mr. Martinez grew up in extreme poverty in Venezuela. His family did not have enough food, and he recalled going to bed hungry many times during his childhood. (PSI ¶ 39). As an adult, he worked as a laborer, making cinder blocks. He made so little money from his full-time job that he went without lunch so that he could purchase food for his family. (DE 88:12).

4

The Court considered "the statements of all the parties, the presentence report which contains the advisory guidelines, and the statutory factors set forth in 18 U.S.C. § 3553(a)." (DE 88:17).

The district court imposed a guideline sentence, and sentenced Mr. Martinez to 108 months' as to Count 1 of the indictment, followed by 2 years of supervised release. (DE 88:17).

This appeal follows.

## Standards of Review

The constitutionality of the Maritime Drug Law Enforcement Act is question of law subject to *de novo* review. *See United States v. Cabezas-Montano,* 949 F.3d 567, n.10 (11th Cir. 2020) (citation omitted).

Whether the government established that the vessel was subject to the jurisdiction to the United States presents an issue of subject matter jurisdiction. *United States v. Tinoco*, 304 F.3d 1088, 1107 (11th Cir. 2002). *De novo* review applies to "a district court's interpretation and application of statutory provisions regarding whether the district court has subject-matter jurisdiction." *Cabezas-Montano*, 949 F.3d at 588 (citing *Tinoco*, 304 F.3d at 1114). "The government bears the burden of establishing that the statutory requirements of MDLEA subject-matter jurisdiction are met." *Id.* at 588 (citing *Tinoco*, 304 F.3d at 1114).

A defendant does not waive a challenge to subject-matter jurisdiction by entering a guilty plea. *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016). Moreover, "because [subject matter jurisdiction] involves a court's power to hear a case, [it] can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in the

district court." *United States v. Cotton*, 535 U.S. 625, 630 (2002)(citation omitted). Further,"[t]he district court's subject-matter jurisdiction is question of law that [this Court will] review *de novo* even when it is raised for the first time" on appeal. *Iguaran*, 821 F.3d at 1336.

## Summary of the Arguments

I.   The Maritime Drug Law Enforcement Act or "MDLEA" rests exclusively on Congress' power to define and punish "Felonies committed on the high Seas" – one of three powers granted to Congress under Article I, Section 8, Clause 10 of the United States Constitution. This Court has previously held that Congress' power under the Felonies Clause is textually limited to the high seas. Mr. Martinez's conviction must be vacated because it did not occur on the high seas, as that term is defined for purposes of the Clause.

Mr. Martinez was arrested on a vessel located 158 nautical miles from the shore of the Dominican Republic. "Under customary international law ... and with respect to other nations, exclusive economic zone means the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States." 33 C.F.R. § 2.30(b). The Exclusive

7

Economic Zone, however, is specifically excluded from the international law definition of the "high seas." *See* 33 C.F.R. § 2.32(d). And it is this definition of the high seas – the one provided by international law – that is relevant under the Felonies Clause. Because Mr. Martinez's offense did not occur on the high seas, within the meaning of the Felonies Clause, the allegations in the indictment fall outside of Congress' enumerated powers, and his conviction must be vacated.

Mr. Martinez's challenge to his conviction survived his guilty plea. The Supreme Court has held that a defendant may challenge the constitutionality of his conviction after a plea, and this Court has repeatedly held that questions regarding the United States' jurisdiction under the MDLEA are questions of subject matter jurisdiction. Therefore, this issue was not waived by Mr. Martinez's entry of an unconditional guilty plea.

II. Mr. Martinez's conviction was obtained in violation of Congress' limited powers under the Felonies Clause for an additional reason. A review of the text, history, and structure of the Constitution show that Congress' power under the Felonies Clause is limited to those felonies which the United States has the right to prosecute under international

8

law. Congress exceeded those boundaries when it defined "vessel without nationality" under 46 U.S.C. § 70502(d)(1)(C) to include vessels which are not stateless under international law. By extending the criminal jurisdiction of the United States to foreigners on foreign vessels, § 70502(d)(1)(C) runs afoul of a core precept of international law. Consequently, § 70502(d)(1)(C) exceeds the limits of Congress' powers under the Felonies Clause. Because the government relied on § 70502(d)(1)(C) to establish jurisdiction in this case, Mr. Martinez's conviction must be vacated.

III.    For purposes of further review, Mr. Martinez maintains that his prosecution both violated due process and exceeded Congress' powers under the Felonies Clause because his offense bore no connection to the United States. Mr. Martinez recognizes that both of these arguments are precluded by precedents of this Court, and respectfully presents these arguments for purposes of *en banc* or *certiorari* review.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### I.

**Mr. Martinez's conviction must be vacated because his offense did not occur on the "high seas" as that term is defined by international law, and therefore his prosecution fell outside of Congress' limited authority under U.S. CONST. art. I, § 8, cl. 10, to define and punish "Felonies committed on the High Seas."**

**A. The MDLEA rests exclusively on Congress' authority to define and punish "Felonies committed on the high Seas."**

The Maritime Drug Law Enforcement Act, or "MDLEA" prohibits the knowing possession of controlled substances with intent to distribute aboard a "covered vessel." 46 U.S.C. § 70503(a)(1). The statute expressly applies "even though the act is committed outside the territorial jurisdiction of the United States," 46 U.S.C. § 70503(b), and requires no connection between the offense and the United States.

Congress' authority to enact the far-reaching MDLEA rests, if at all, on its power to define and punish "Felonies committed on the high Seas," under Article I, Section § 8, Clause 10, of the United States Constitution. *See* U.S. CONST. art. I, § 8, cl. 10 ("The Congress shall have Power ... to define and punish Piracies and Felonies committed on the

10

high Seas, and Offences against the Law of Nations.") ("Clause 10").[2] This is the only expressly extraterritorial grant of power in the Constitution. And this Court has "always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1257 (11th Cir. 2012) (holding that Congress could not proscribe drug trafficking under the Offences Clause because drug trafficking is not a violation of customary international law); *United States v. Davila-Mendoza*, 972 F.3d 1264 (11th Cir. 2020) (holding that Congress lacked power to enact the MDLEA pursuant to the Foreign Commerce Clause).

The Felonies power, however, is "textually limited to conduct on the high seas." *See Bellaizac-Hurtado*, 700 F.3d at 1258. Consequently, Congress' power to enforce the MDLEA is similarly constrained. *See id.* (holding "that Congress exceeded its power, under the Offences Clause, when it proscribed the defendants' conduct in the territorial waters of Panama"); *Davila-Mendoza*, 972 F.3d at 1267 (similarly vacating

---

[2] In this brief, Mr. Martinez uses either "Clause 10" or the "Define and Punish Clause" to refer to Article I, Section 8, Clause 10 as a whole. When referring specifically to Congress' power to "define and punish ... Felonies committed on the high Seas," Mr. Martinez uses the term "Felonies Clause."

11

MDLEA convictions of defendants arrested in Jamaican territorial waters).

Mr. Martinez was arrested 158 miles southeast of the Dominican Republic. "Under customary international law ... and with respect to other nations, exclusive economic zone means the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States." 33 C.F.R. § 2.30(b). The question before the Court, therefore, is whether the waters located within the Exclusive Economic Zone are part of the "high seas" within the meaning of the Felonies Clause. They are not. Rather, the term "high seas," within the Felonies Clause, is defined by international law; and international law defines the high seas to exclude the EEZ. *See* 33 C.F.R. § 2.32(d). Because Mr. Martinez's offense did not occur on the "high seas" within the meaning of the Felonies Clause, the allegations in the indictment fall outside of Congress' enumerated powers, and his conviction must be vacated.

### B. The term "high seas," within the meaning of the Felonies Clause, is defined by international law.

"The Supreme Court has explained that the power to 'define' in Article I, Section 8, Clause 10 is limited by the three specific subjects of

12

the Clause." *Bellaizac-Hurtado*, 700 F.3d at 1249. This Court has held, furthermore, that the "text, history, and structure of the Constitution confirm that the power to 'define'," in Clause 10, "is limited by the law of nations." *Id.* (holding that the "power to 'define' offenses against the law of nations does not grant Congress the authority to punish conduct that is not a violation of the law of nations").

"During the Founding period, the word 'define' meant '[t]o give the definition; to explain a thing by its qualities' and 'to circumscribe; to mark limits.'" *Id.* (citations omitted). With respect to the Law of Nations Clause, the Court held that "[t]hese definitions reveal that the word 'define' would not have been understood to grant Congress the power to create or declare offenses against the law of nations, but instead to codify and explain offenses that had already been understood as offenses against the law of nations." *Id.* at 1250. "The insertion of the power to 'define' enabled Congress to provide notice to the people through codification; it did not enable Congress to create offenses that were not recognized by the law of nations." *Id.* at 1250.

The Court's historical understanding of the term "define" was confirmed by the structure of the Constitution as one creating a

government of enumerated powers. The Court held that "[i]f Congress could define any conduct as a 'piracy' or a 'felony' or an 'offense against the law of nations', its power would be limitless and contrary to our constitutional structure." *Bellaizac-Hurtado*, 700 F.3d at 1250. Congress' power to define "the high Seas" is similarly limited. The Felonies Clause does not give Congress the authority to recast the boundaries of the high seas in any manner it sees fit. Were that the case, Congress would be able to unilaterally expand the geographic sphere of its authority – in contravention of our constitutional structure. Instead, the "high Seas" referenced in Clause 10 must be construed according to the definition of the high seas under international law.

This understanding is consistent with how the Framers would have understood the term. "[W]hen the framers gathered to write the Constitution they included among their chief priorities endowing the national government with sufficient power to ensure the country's compliance with the law of nations." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) (Gorsuch, J., concurring) (explaining that, under the Articles of Confederation, the States' regular failures to redress injuries caused by their citizens to foreigners posed an "existential threat to the

14

new nation"). Not surprisingly, therefore, when it came to Clause 10 – the only expressly extraterritorial grant of power in the Constitution – the Framers incorporated terms from international law. "Offences against the Law of Nations," "Piracies," and "Felonies" are "all concepts taken directly from international law." See *United States v. Dávila-Reyes*, 23 F.4th 153, 179 (1st Cir. 2022), *reh'g en banc granted and opinion withdrawn*, 38 F.4th 288 (1st Cir. July 5, 2022).[3]  These phrases were "familiar shorthand" for "international law concepts" and their inclusion in the Constitution is "strong evidence that the Framers intended the Define and Punish clause to align with the international law understanding of those concepts." *Id.*

Viewed outside of this historical context, Clause 10 would seem to "contain[] a striking double redundancy." Eugene Kontorovich, *The 'Define and Punish' Clause and the Limits of Universal Jurisdiction*, 103 NW. U. L. REV. 149, 160 (2009). "'Piracies' refers to a particular crime. 'Felonies,' in contrast, describes a broad category, as does 'Offenses

---

[3] Although the panel decision in *Dávila-Reyes* has been withdrawn pending *en banc* review in the First Circuit, its historical analysis is sound, and its reasoning is fully consistent with this Court's analysis in *Bellaizac-Hurtado*.

against the Law of Nations.' Piracy is a subspecies of felony, and one that necessarily occurs on the high seas. Moreover, piracy was an offense against the law of nations." *Id.* at 163 (footnotes omitted). The apparent redundancy disappears, however, when one recognizes that under international law, these three categories of offenses have distinct meanings and different jurisdictional scopes.

During the founding era, piracy was understood to have a fixed meaning in international law, and was the only universal jurisdiction offense. *See id.* at 164-65. The Supreme Court made clear, early on, that Congress could not simply call any offense piracy, and thereby subject the same to universal jurisdiction. *See Bellaizac-Hurtado*, 700 F.3d at 1249 (citing *United States v. Furlong*, 18 U.S. (5 Wheat) 184, 109 (1820)). Nor could Congress simply declare drug trafficking a violation of international law and therefore expand its own powers under the Law of Nations Clause. *See id.* at 1249-50.

It was similarly a "well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to

16

international law." *Dávila-Reyes*, 23 F.3d at 179 (citations omitted and emphasis added). *See also United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630–34 (1818) (holding that Congress could not extend U.S. jurisdiction to foreigners on foreign vessels for the common law form of robbery); *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 197–98 (1820) (holding the same for murder on a foreign vessel, and again contrasting piracy, which can be punished by Congress "even when committed by a foreigner upon a foreigner in a foreign ship"). Thus, what appears at first blush to present a redundancy in Clause 10, instead reflects the Framers' intent to grant Congress the authority to define and punish piracies, felonies, and offenses against the law of nations as distinct grants of power, each taking on the distinct jurisdictional limitations accorded to them by international law.

Like "Piracies," and "Offences against the Law of Nations," the "high seas" is a term that has a known and ascertainable meaning under international law. The inclusion of the term high seas in Clause 10 must therefore also be understood to take on the meaning attributed to it by international law. And that meaning excludes the area in which Mr. Martinez's vessel was located at the time of his arrest.

17

**C. Under international law, the Exclusive Economic Zone is not part of the high seas.**

The Exclusive Economic Zone ("EEZ") was recognized in the 1982 United Nations Convention on the Law of the Seas ("UNCLOS"), 1833 U.N.T.S. 397, 21 ILM 1261 (1982).[4] "The exclusive economic zone is an area beyond and adjacent to the territorial sea ... under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention." UNCLOS art. 55. Coastal states have sovereign rights regarding the conservation, management, and exploitation of natural resources within their EEZ; all states, however, may enjoy the freedoms of navigation and overflight, as well as other "internationally lawful uses of the sea" within the EEZ. *See* UNCLOS arts. 56-58.

The EEZ is thus neither territorial waters, nor the high seas. It is something distinct, which contains features of both. What is significant for present purposes, however, is that under "customary international

---

[4] The full text of the UNCLOS is available at: https://www.un.org/depts/los/convention_agreements/texts/unclos/unclos_e.pdf.

law," the EEZ is not the high seas. This fact is recognized in the Code of

Federal Regulations:

> Under customary international law as reflected in the 1982
> United Nations Convention on the Law of the Sea and without
> prejudice to high seas freedoms that may be exercised within
> exclusive economic zones pursuant to article 58 of the United
> Nations Convention on the Law of the Sea, and unless the
> context clearly requires otherwise . . . high seas means all
> waters that are not the exclusive economic zone (as defined in
> § 2.30), territorial sea (as defined in § 2.22), or internal waters
> of the United States or any other nation.

33 C.F.R. § 2.32(d) (emphasis added). And, while other definitions of the

"EEZ" may be found, it is this definition of "high seas" – the one provided

by customary international law – that is relevant here.

A hypothetical proves the point: Imagine that the United States

made it a crime for any person aboard a vessel "subject to the jurisdiction

of the United States" to explore or exploit minerals from the seabed. Such

a law might well be viewed as benign to a nation whose minerals were at

risk of being exploited. But the law would nonetheless intrude on that

nation's sovereignty over the resources in their EEZ. And it would

nonetheless contravene the Framers' understanding of the Felonies

Clause, as respecting other nations' sovereign rights under international

law.

19

To be clear, Mr. Martinez does not maintain that the EEZ is the same as a nation's "territorial waters. The UNCLOS makes plain, however, that the EEZ is not the "high seas." And because Mr. Martinez was not arrested on the high seas, his offense fell outside of Congress' limited powers, and the district court lacked jurisdiction to enter the conviction in this case.

## II.

**Mr. Martinez's conviction must be vacated because Congress exceeded its authority under the Felonies Clause by defining "vessel without nationality" in 46 U.S.C. § 70502(d)(1)(C), to include vessels that are not stateless under international law.**

By original constitutional design, Congress's authority to "define and punish ... Felonies committed on the high Seas," U.S. CONST. art. I, § 8, cl. 10, is inherently limited by principles of international law. Congress exceeded that authority when it defined the term "vessel without nationality," in 46 U.S.C. § 70502(d)(1)(C), to include vessels that are not considered stateless under international law.

### A. Statutory background

The Maritime Drug Law Enforcement Act, or "MDLEA" prohibits the knowing possession of controlled substances with intent to distribute aboard a "covered vessel." 46 U.S.C. § 70503(a)(1). "A 'covered vessel' is

20

the first link in a chain of facts that determines subject-matter jurisdiction." *United States v. Nunez,* 1 F.4th 976, 984 (11th Cir. 2021) (citing *United States v. De La Garza,* 516 F.3d 1266, 1271-72 (11th Cir. 2008)). The MDLEA defines a "covered vessel" to include, among other things, "a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(e). And a "vessel subject to the jurisdiction of the United States" includes "a vessel without nationality." 46 U.S.C. § 70502(d)(1)(A)-(C).

As currently codified, the MDLEA states that "the term 'vessel without nationality' includes –"

> (A)　a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B)　a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C)　a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

It is only § 70502(d)(1)(C) that is at issue in this case. That section "displaces the prima facie showing of nationality that arises from an oral

21

asserction of nationality or registry – made in accordance with international law – without any affirmative evidence to the contrary." *See United States v. Dávila-Reyes*, 23 F.4th 153, 186 (1st Cir. 2022), *reh'g en banc granted, opinion withdrawn,* 38 F.4th 288 (1st Cir. 2022). In this manner, Congress has written the statute in violation of international law, and exceeded its powers under the Felonies Clause.

**B.  Section 70502(d)(1)(C) authorizes the United States to assert jurisdiction over vessels which are not stateless under international law**.

"To insure the principle of freedom of the seas, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas." *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982) (citations omitted). "Indeed, such vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly." *Id.* (citations omitted). *See also* UNCLOS art. 92 ("Ships sail under the flag of one State only and, save in exceptional cases ... shall be subject to its exclusive jurisdiction on the high seas.").

Although this principle is "subject to recognized exceptions," *see Marino-Garcia*, 679 F.2d at 1380, the government did not establish that any such exception applied in this case. Instead, it relied on the premise,

22

supported by § 70503(d)(1)(C)'s overbroad definition of a "vessel without nationality," that the vessel was stateless, and thus no such exception was required. *See Marino-Garcia,* 679 F.3d at 1381 ("These restrictions on the right to assert jurisdiction over foreign vessels on the high seas and the concomitant exceptions have no applicability in connection with stateless vessels. Vessels without nationality ... have no internationally recognized right to navigate freely on the high seas.") (citations omitted). The government failed to establish, however, that the vessel was stateless.

Nationality of ships is not limited only to those ships flying a literal, physical flag. *See United States v. Matos-Luchi*, 627 F.3d 1, 17 (1st Cir. 2010) (Lipez, J., dissenting) ("Registration, documentation, and the flag are 'indicators' of vessel nationality, but they are not sources of vessel nationality.") (citations omitted). Article 91 of the UNCLOS states that "[s]hips have the nationality of the State whose flag they are entitled to fly." *See also* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 501 ("A ship has the nationality of the state that registered it and authorized it to fly the ship's flag."). But "[t]here is nothing at all in Article 91 stating that a ship has

23

to fly a flag." Barry Hart Dubner & Mary Carmen Arias, *Under International Law, Must A Ship On The High Seas Fly A Flag Of A State In Order To Avoid Being A Stateless Vessel?  Is A Flag Painted On Either Side Of The Ship Sufficient To Identify It?,* 29 U.S.F. MAR. L.J. 99, 130 (2016-2017) ("Against this background, it is obvious that a ship does not necessarily have to fly a flag on the high seas.").

"International law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality." *See Dávila-Reyes*, 23 F.4th at 186. And, under the MDLEA, a claim of nationality or registry may be asserted through possession of documents evincing the vessel's nationality; "flying its nation's ensign or flag"; or "a verbal claim of nationality or registry by the master or individual in charge of the vessel." 46 U.S.C. § 70502(e).

International law "recognizes two specific circumstances in which a vessel may be deemed stateless regardless of its actual status and absent any effort to determine its nationality: when the vessel refuses to claim any nationality or when it claims more than one nationality." *See Dávila-Reyes*, 23 F.4th at 187. Article 92 of UNCLOS specifically states:  "A ship which sails under the flags of two or more States, using them according

24

to convenience, . . . may be assimilated to a ship without nationality." But no similar principle exists for the mere failure of the nation of registry to immediately verify a claim. Section § 70502(d)(1)(C) thus adds a ***new*** category to the limited circumstances in which international law deems a vessel stateless (the refusal to claim a nationality, claiming more than one nationality, and disavowal of a claim of nationality by the named country). Under the statute, a response stating only that the country is unable to confirm nationality, or the country's failure to provide any response, suffices to nullify even an unequivocal claim of nationality or registry made by the person in charge of the vessel. *Id.*

In this case, a prima facie claim of registry was made when Mr. Martinez made a verbal claim of nationality for the vessel. The fact that the government of Colombia did not immediately confirm the claim was not sufficient to render the vessel stateless under international law.

This Court implicitly recognized that the MDLEA conflicts with international law, in *United States v. Lopez Hernandez*, 864 F.3d 1292, 1299 (11th Cir. 2017), when it observed that "MDLEA statelessness does not turn on actual statelessness, but rather on the response of the foreign government." There, the master of the vessel claimed that the ship was

25

registered in Guatemala – "and claimed so truthfully, as it later turned out." *Id.* at 1296. "[T]he U.S. government asked the Guatemalan government to confirm or deny the vessel's registry; and ... the Guatemalan government responded that it 'could neither confirm nor deny that the go-vast vessel was registered in Guatemala.'" 864 F.3d at 1298-99. The vessel was therefore considered "without nationality," and a conviction was obtained under § 70502(d)(1)(C).

On appeal, the defendants argued that the Coast Guard had information that would have enabled it to easily confirm the vessel's registry, but had failed to do so in bad faith. *Id.* at 1299. This Court rejected that claim, explaining that statutory jurisdiction under § 70502(d)(1)(C) does not depend not on the actual statelessness of the vessel, but instead on the foreign government's response. *Lopez Hernandez*, 864 F.3d at 1292. As *Lopez Hernandez* shows, § 70502(d)(1)(C) allows the United States to treat as stateless a vessel that is in fact registered to a foreign nation and subject to the exclusive jurisdiction of its flag-state under international law.

**C. Congress exceeded its power under the Felonies Clause by defining "vessel without nationality" to include vessels that are not stateless under international law.**

26

The Define and Punish Clause was adopted as part of Congress's enumerated powers to deal in foreign relations. *Dávila-Reyes*, 23 F.4th at 186. The Framers' "commitment to international law principles was both pragmatic and ideological." *Id.* at 176. They believed that honoring the law of nations was both a moral obligation, and essential to becoming a nation. *See id.* (citations omitted). "Hence, as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations." *See id.* at 176 (citation omitted).

The use of the international law terms "Piracies," "Felonies," and "Offences against the Law of Nations" provides "strong evidence" that the Framers "intended the Define and Punish Clause to align with the international law understanding of those concepts." *Dávila-Reyes*, 23 F.4th at 176. As a congressman, John Marshall argued that the Define and Punish Clause "can never be construed to make the government a grant of power which the people making it, did not themselves possess." *See id.* at 182 (citation omitted). John Quincy Adams later wrote that "the legislative powers of Congress are ... limited to specific grants contained in the Constitution itself, all restricted on one side by the power of

27

internal legislation within the separate States, ***and on the other, by the laws of nations*****.**" *Id.* (quoting John Quincy Adams, The Jubilee of the Constitution 71 (1839)) (emphasis supplied by the court).

This review of the historical record, early case law, and the terms of art used in Clause 10, led the court to conclude "that the Constitution's drafters intended that Congress's authority under the Define and Punish clause, including the Felonies portion of it, be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas." *Id.* at 183 (emphasis added).

Because the exercise of jurisdiction under § 70502(d)(1)(C) does not comport with international law, it exceeds Congress' authority under the Felonies Clause. *See Dávila-Reyes*, 23 F.4th at 195. And because this "constitutional flaw" is "evident in the statutory terms themselves, § 70502(d)(1)(C) is facially unconstitutional" *id.* at 193 n.61, as well as applied to the facts of this case.

**D. This is a case of first impression.[5]**

---

[5] As mentioned, this issue is pending before the Court in other cases, including *United States v. Lopez-Padilla*, No. 22-11047, and *United States v. Jhonathan Alfonso*, No. 22-10576.

### 1. The Court has never considered whether Congress' powers under the Felonies Clause are limited by international law.

Although this Court has addressed the MDLEA in other contexts, "none of [the Court's] earlier precedents about the extraterritorial application of our drug trafficking laws have answered the constitutional question presented in this appeal." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1257 (11th Cir. 2012). Specifically, this Court has never squarely addressed whether the Felonies Clause is inherently limited by international law.

To be clear, the issue here is not simply whether Congress may ever exceed or violate international law. Mr. Martinez acknowledges that Congress is free to exceed the bounds of international law – so long that it stays within the confines of its enumerated powers. The claim here, however, is that the Felonies Clause, by original design, incorporates the principles of international law in its grant of authority to Congress. Thus, 46 U.S.C. § 70505, which states that a defendant "does not have standing to raise a claim of failure to comply with international law as a basis for a defense," does not resolve the constitutional question of whether Congress exceeded its authority under

29

the Felonies Clause in defining statelessness under § 70502(d)(1)(C) in a manner that contradicts international law.

Nor was the constitutional question herein resolved in *Lopez Hernandez*. The *Lopez Hernandez* defendants argued that the government had not established statutory jurisdiction pursuant to § 70502(d)(1)(C), because the vessel was not actually stateless, and because the Coast Guard had information that would have enabled it to confirm the registration, but failed to do so in bad faith. 864 F.3d at 1299. The panel rejected this claim, reasoning that statutory jurisdiction under § 70502(d)(1)(C) does not depend on actual stateless, but rather on the foreign government's response. *Id.* at 1299. But the *Lopez Hernandez* "defendants did not make the argument asserted" here, "that "§ 70502(d)(1)(C) is unconstitutional because Congress acted beyond its authority under the Felonies Clause in defining a vessel without nationality to include a vessel whose master makes a verbal claim of nationality that is not affirmatively and unequivocally confirmed by the identified country." *Dávila-Reyes*, 23 F.4th at 190 n.53 (emphasis added). In other words, the defendants never argued, and the panel never considered, whether Congress's authority to "define and punish . . .

30

Felonies committed on the high seas" is limited by international law because the Felonies Clause itself, "by original design, requires Congress to adhere to the jurisdictional limits of international law with respect to determining statelessness." *Id.* at 184 (footnote omitted). Because the Court was not "confronted with the question" it faces today, the Court cannot be said to have resolved it. *See United States v. Edwards*, 304 F.3d 1088, 1112 (11th Cir. 2021) (citing *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004), for the proposition that "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents.") (further citation omitted).

> **2.    The Court has never held that the protective principle – or any other recognized theory of jurisdiction – would authorize the prosecution in this case.**

The Court has similarly never decided whether the prosecution of an offense committed aboard a vessel for which a prima facie claim of nationality was asserted, in the absence of the flag-nation's consent, violates international law.

"Customary international law recognizes five theories of jurisdiction: territorial, protective, national, passive personality, and

31

universality." *Bellaizac-Hurtado*, 700 F.3d at 1259 (Barkett, J., specially concurring). "The first four theories permit nations to exercise jurisdiction over offenses that implicate domestic interests – that is, offenses that occur within a nation's territory and those that occur outside the territory but have effects within it." *Id.* at 1260. In *Bellaizac-Hurtado*, Judge Barkett found that, "because the drug trafficking occurred outside of United States territory and had no impact on the interests of the United States, the only potential basis for jurisdiction" was the "universality principle." *Id.* As Judge Barkett recognized, however, drug trafficking is not subject to "universal jurisdiction," and no other basis of jurisdiction authorized the prosecution in that case. *See id.*

The government argued *in Bellaizac-Hurtado* that drug trafficking was subject to universal jurisdiction based on Congress's finding that "drug trafficking is 'universally condemned,' and is a 'threat to the societal and well-being of the United States.'" *Bellaizac-Hurtado*, 700 F.3d at 1260 (Barkett, J., specially concurring). But "it is not Congress' declaration that establishes conduct as subject to universal jurisdiction under customary international law. Rather, the scope of universal

32

jurisdiction is 'ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" *Id.* (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820)).

For reasons similar to those that led the *Bellaizac-Hurtado* Court to hold that that drug trafficking is not an Offence against the Law of Nations, drug trafficking is also not subject to universal jurisdiction. Specifically, "[n]o source of customary international law has designated drug trafficking as being subject to universal jurisdiction" and "[t]he academic community is in accord that drug trafficking is not considered a universal jurisdiction offense." *Bellaizac-Hurtado*, 700 F.3d at 1260-61 (Barkett, J., specially concurring). *See also* Eugene Kontorovich, *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes*, 93 MINN. L. REV. 1191, 1229 (April 2009) ("Drug trafficking is not recognized in [customary international law] as a universally cognizable offense. ... All U.S. courts that have considered the issue have held that narcotics traffic falls outside UJ ... There appears to be no state practice establishing UJ over drug trafficking ....") (footnotes omitted).

33

Judge Barkett further found that "no other internationally recognized jurisdictional basis applies." *Bellaizac-Hurtado*, 700 F.3d at 1259-60 (Barkett, J., specially concurring). Judge Barkett's observation was correct, and accurately reflects the law of this Circuit. *See also id.* at n.4 ("drug trafficking is not subject to universal jurisdiction and no other jurisdictional basis exists").

Although several of the Court's decisions contain statements suggesting that MDLEA prosecutions might or could be justified under the protective principle of international law, in each instance the invocation of the protective principle was dicta. "[T]he 'holding' of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) (citation omitted). "All statements that go beyond the facts of the case. . . are dicta. And dicta is not binding on anyone for any purpose." *United States v. Birge*, 830 F.3d 1229, 1232 (11th Cir. 2016) (internal quotation marks and citations omitted). "Views expressed in dicta are less reliable than those embodied in holdings." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring specially). "Deciding

real issues presented by real parties in real time focuses judicial decision making in ways that making speculative pronouncements about hypothetical questions cannot." Dicta is further less reliable because it is "effectively insulated from en banc or Supreme Court review." *Id.* And "the Court's dicta, even if repeated, does not constitute precedent." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022).

The invocation of the "protective principle" dicta in prior cases before the Court appears to emanate from *United States v. Romero-Galue*, 757 F.2d 1147 (11th Cir. 1985), which involved the materially distinguishable "Marijuana on the High Seas Act," under 21 U.S.C. § 955(c) (1982) (the "MHSA"). Unlike the broader MDLEA, the MHSA only applied to vessels within the customs waters of the United States. The customs waters of the United States, however, were defined for the purpose of the statute to include, in the case of a foreign vessel "subject to a treaty or other arrangement between a foreign government and the United States," the waters "within such distance of the coast of the United States" as permitted by said treaty or arrangement. *See Romero-Galue*, 757 F.2d at 1151-1152. This Court held, in *Romero-Galue* that the district court erred in dismissing an indictment because the vessel was

35

found more than 12 miles from shore, and that "[n]othing in international law prohibits two nations from entering into a treaty, which may be amended by other arrangement, to extend the customs waters and the reach of the domestic law of one of the nations into the high seas." *Id*. at 1154. The Court thereafter added that, "[e]ven absent a treaty or arrangement, the United States could, under the 'protective principle' of international law, prosecute foreign nationals on foreign vessels on the high seas for the possession of narcotics." *Id*. at 1154 (citations omitted). But that statement was pure *obiter dictum*, because the statute in question required such a "treaty or other arrangement" in order to extend the customs waters of the United States, and enforce the United States' jurisdiction. There was thus no need for the Court to consider what, if any, principle of international law might allow the prosecution of foreigners on a foreign vessel in the absence of such an international agreement.

Nonetheless, Romero-Galue's *dicta* about the protective principle was repeated (again in *dicta*) in subsequent opinions. It was first repeated in *United States v. Gonzalez*, 776 F.2d 931 (11th Cir. 1985), another case interpreting the materially distinguishable MHSA. The

36

*Gonzalez* dictum was subsequently cited by the Court in *United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002), and thus made its way into this Court's MDLEA jurisprudence. But the appellants in *Tinoco* once again raised wholly different challenges to their convictions. *See Tinoco*, 304 F.4d at 1108-09 (holding, *inter alia*, that the jurisdictional requirement in the MDLEA "does not constitute a traditional element of an offense," and that the defendants did not have a right to a jury finding on the facts giving rise to jurisdiction).

This Court has never previously decided whether a wholly foreign drug trafficking offense may be prosecuted, in the absence of a flag-nation's consent, under the protective principle of international law. And, consequently, it has never actually so held.

### 3. The protective principle of international law does not authorize the prosecution.

Under the protective principle:

International law recognizes the right of a state to punish a limited class of offenses committed outside its territory by persons who are not its nationals – offenses directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems, *e.g.,* espionage, counterfeiting of the state's seal or currency, falsification of official documents, as well as perjury before

37

consular officials, and conspiracy to violate the immigration or customs laws.

RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE UNITED STATES § 402(f). As Judge Barkett correctly observed, the principle does ***not*** authorize the prosecution of wholly foreign drug offenses, bearing no ties to the United States. *See Bellaizac-Hurtado*, 700 F.3d at 1259 (Barkett, J., specially concurring).

"The protective principle is one of limited and uncertain scope." Kontorovich, *Beyond the Article I Horizon*, 93 MINN. L. REV. at 1229. "Commentators stress that the category of protective jurisdiction offenses is quite small, and none suggest drug smuggling as one of them." *Id.* (footnote omitted). In fact, "no treaty, law or state practice supports such broad jurisdiction over drug offenses." *Id.*

Drug trafficking on vessels is not "directed against the security of the state," and does not "threaten the integrity of government functions" in any manner comparable to the other examples listed in the Restatement. Professor Kontorovich stresses that "the security of the state," in this sense, "refers to the safety and integrity of the state apparatus itself (its 'government functions' or 'state interests'), not its overall physical and moral well-being." *Id.* (citation omitted). "All these

38

crimes are aimed at or particularly involve the government apparatus of the forum state." *Id.* Wholly foreign drug trafficking crimes are obviously not "aimed at" the government apparatus of the United States, and thus do not fall within the protective principle.

Professor Kontorovich took issue with this Court's *dictum* in *Gonzalez*, that "[t]he protective principle does not require that there be proof of an actual or intended effect inside the United States. The conduct may be forbidden if it has a potentially adverse effect and is generally recognized by nations that have reasonably developed legal systems." *See* Kontorovich, *Beyond the Article I Horizon*, 93 MINN. LAW REV. at 1230 n.268 (quoting *Gonzalez*, 776 F.2d at 939 n.11). Kontorovich noted that the Court "cited Restatement (Second) of Foreign Relations Law as support for this proposition, though the Restatement does not explicitly say anything of the sort." He further observed that the Restatement (Third) "seems even clearer in its insistence that the conduct actually have effects in the forum state," citing a comment that "[t]he protective principle may be seen as a special application of the effects principle...." Kontorovich, *Beyond the Article I Horizon*, 93 MINN. L. REV. at 1130, n. 268 (citation omitted).

Ultimately, treating drug crimes as falling within protective jurisdiction would "eliminate any difference between protective jurisdiction and universal jurisdiction." *Id.* at 1131. "Indeed, protective jurisdiction would sweep more broadly than even UJ by allowing states to punish relatively minor crimes." *Id.* This is obviously inconsistent with both the practice of nations, and the consensus of scholars writing on international law. *See id.* It is thus inconsistent with customary international law. *See Bellaizac-Hurtado*, 700 F.3d at 1260 (Barkett, J., specially concurring).

The government bore the burden of showing that the vessel aboard which Mr. Martinez was apprehended was subject to the jurisdiction of the United States. *See United States v. Iguaran*, 821 F.3d 1335, 1338 (11th Cir. 2016). Because no principle of international law authorized the prosecution in this case, Mr. Martinez's conviction fell outside of Congress' Article I powers under the Felonies Clause. The district court therefore lacked jurisdiction over the offense, and Mr. Martinez's conviction must be vacated.

## III.

**The United States' prosecution of Mr. Martinez, a national of Venezuela, for a drug-trafficking offense**

**committed 158 nautical miles southeast of the Dominican Republic (a) violated Due Process and (b) exceeded Congress' powers under the Felonies Clause, because the offense bore no connection to the United States.**

For purposes of further review, Mr. Martinez maintains that his prosecution both exceeds Congress' limited powers and violates due process based on the absence of any nexus between his offense and the United States.

Congress' power under the Felonies Clause does not extend to drug trafficking offenses bearing no connection to the United States. *See United States v. Angulo-Hernández*, 576 F.3d 59, 60 (1st Cir. 2009) (Torruella, J., dissenting from the denial of en banc review) ("The term 'Felonies' has not been read to include all felonies, but rather only felonies with an adequate jurisdictional nexus to the United States.") (citing *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 189 (1820)). *See generally also* Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction*, 103 Nw. U. L. Rev. 149, 163-4 (Winter 2009) (discussing the history of art. I, § 8, cl. 10, and arguing that the Felonies Clause is limited to felonies with a nexus to the United States). Mr. Martinez acknowledges, however, that this Court has

41

rejected similar arguments. *See United States v. Campbell*, 734 F.3d 802, 809-810 (11th Cir. 2014) (rejecting the argument "that Congress exceeded its authority under the Felonies Clause when it enacted the Act because his drug trafficking offense lacked any nexus to the United States"). Mr. Martinez therefore maintains this argument for purposes of further review.

Mr. Martinez further maintains that his prosecution in the United States, in the absence of any nexus between this forum and his offense, violates due process. Mr. Martinez was neither present in the United States nor any United States territory at the time of the offense. He is not a U.S. national, nor was he domiciled here prior to his arrest. He carried on no business or activity in the United States. There is no evidence that the drugs were destined for the United States, or that the offense would have a direct and foreseeable effect within the United States. The exercise of civil jurisdiction under circumstances such as these would clearly violate due process. *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (holding that, in order to subject a defendant to a civil judgment, due process requires that the individual "have certain minimum contacts with [the forum state] such

42

that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice''') (internal citation omitted). There is no reason why the Due Process Clause should have any less force in limiting the criminal jurisdiction of United States courts. *See United States v. Zakharov*, 468 F.3d 1171, 1177 (9th Cir. 2006) (holding, in cases involving registered vessels, due process requires a "nexus between the United States and the defendant's activities," that is analogous to the "minimum contacts" required in personal jurisdiction analysis). Once again, Mr. Martinez acknowledges that this issue is foreclosed by precedent and maintains this argument for purposes of further review. *See United States v. Cabezas-Montano*, 949 F.3d 567, 587 (11th Cir. 2020).

43

## CONCLUSION

For the foregoing reasons, Mr. Martinez's conviction must be vacated.

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*/s/ Bunmi Lomax*
BUNMI LOMAX
Assistant Federal Public Defender
150 West Flagler Street, Suite 1500
Miami, Florida 33130-1555
Telephone No. (305) 530-6900

# CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 8,331 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook font.

*/s/ Bunmi Lomax*
**BUNMI LOMAX**

## CERTIFICATE OF SERVICE

I HEREBY certify that on this date, January 11, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent seven copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Lisa Tobin Rubio, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.


*/s/ Bunmi Lomax*
**BUNMI LOMAX**

46